# United States Court of Appeals
## For The First Circuit

---

No. 23-1694

**UNITED STATES**, ex rel. Frederic P. Zotos;
**COMMONWEALTH OF MASSACHUSETTS**, ex rel. Frederic P. Zotos,

Plaintiffs - Appellants,

v.

**TOWN OF HINGHAM**; **ROGER FERNANDES**, individually and as former Town Engineer; **TOM MAYO**, individually and as Town Administrator; **TED C. ALEXIADES**, individually and as former Town Administrator, former Town Accountant/Finance Director; **KEVIN E. PAICOS**, individually and as former Town Administrator; **SUSAN NICKERSON**, individually and as Town Accountant,

Defendants - Appellees.

---

On Appeal from a Judgment of the United States District Court
For the District of Massachusetts

---

### REPLY BRIEF OF THE PLAINTIFFS-APPELLANTS

---

Frederic P. Zotos
1st Cir. Bar No. 1161035
28 Old Coach Road
Cohasset, MA 02025
fzotos@pathogenics.com
(781) 836-4295

**Table of Contents**

Table of Authorities .................................................................................................. ii

STATEMENT OF THE ISSUES (cont.).............................................................1

ARGUMENT .........................................................................................................1

   **I.**    **Res Judicata** ............................................................................................1

   **II.**    **False Claims** ........................................................................................4

      A.    Falsity ................................................................................................4

         1.    Federal Highway Statutes and Regulations ............................5

         2.    Massachusetts Highway Statutes and Regulations ..............17

      B.    Scienter ............................................................................................21

      C.    Statute of Limitations ......................................................................26

CONCLUSION....................................................................................................28

CERTIFICATE OF COMPLIANCE ...............................................................29

CERTIFICATE OF SERVICE .........................................................................29

# Table of Authorities

## U.S. Cases

*Cochise Consultancy, Inc. v. Hunt*,
    139 S. Ct. 1507 (2019)……………………………………………………26-27

*U.S. ex rel. Eisenstein v. City of New York*,
    556 U.S. 928 (2009)………………………………………………………1-2

*INS v. Hibi*,
    414 U.S. 5 (1973)……………………………………………………………3

*United States v. Mendoza*,
    464 U.S. 154 (1984)……………………………………………….....2-3

*United States et al. ex rel. Schutte v. Supervalu Inc.*,
    143 S. Ct. 1391 (2023)…………………………………….......21, 24-25

*Taylor v. Sturgell*,
    553 U.S. 880 (2008)………………………………………………………1

## 1st Circuit Cases

*United States ex rel. Concilio De Salud Integral De Loiza, Inc. v. J.C. Remodeling, Inc.*,
    962 F.3d 34 (1st Cir. 2020)…………………………………………...26

*Corp. Techs., Inc. v. Harnett*,
    731 F.3d 6 (1st Cir. 2013)…………………………………………….25

*Dayton v. Peck, Stow and Wilcox Co.*,
    739 F.2d 690 (1st Cir. 1984)…………………………………………25

## 1st Circuit Cases (cont.)

*US ex rel. Jones v. Brigham and Women's Hosp.*,
  678 F. 3d 72 (1st Cir. 2012)…………………………………………...4-5, 21

*United States ex rel. Hutcheson v. Blackstone Medical, Inc.*,
  647 F. 3d 377 (1st Cir. 2011)…………………………………………..5

*United States v. Rivera*,
  55 F.3d 703 (1st Cir. 1995)……………………………………...4, 27

*United States and Commonwealth of Mass. ex rel. Escobar v. Universal Health Servs., Inc.*,
  780 F. 3d 504 (1st Cir. 2015)…………………………………………23

## District of Massachusetts Cases

*United States ex. rel. Zotos et al. v. Town of Hingham et al.*,
  19-cv-12002-NMG (D. Mass. Jul. 21, 2023)………………………………..3

## Massachusetts Cases

*Belezos v. Bd. of Selectmen of Hingham*,
  99 Mass.App.Ct. 1114 (November 14, 2017)…………………………..18-19

*Dowling v. Registrar of Motor Vehicles*,
  425 Mass. 523 (1997)……………………………………………………18

*Registrar of Motor Vehicles v. Board of Appeal on Motor Vehicle Liab. Policies & Bonds*,
  382 Mass. 580 (1981)…………………………………………...……..18

## Other Jurisdiction Cases

*United States et al. ex rel. Alejandro v. Philadelphia Vision Center et al.*,
    20-2027 (E.D. Pa. January 4, 2021)……………………………………3

*U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*,
    336 F.3d 346 (5th Cir. 2003)………………………………………...2

*United States ex rel. Lusby v. Rolls-Royce Corp.*,
    579 F.3d 849 (7th Cir. 2009)………………………………………...2

*United States v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010)……………………………………..5

*United States ex rel. Sorenson v. Wadsworth Brothers Construction Company, Inc.*,
    2:16-cv-875 (D. Utah June 5, 2019)…………………………………3

## Federal Statutes

23 U.S.C. § 109(d)…………………………………...…………………..6

23 U.S.C. § 402(a)…………………………………..……………….....6

31 U.S.C. § 3729(b)………………………………………………….21

31 U.S.C. § 3729(b)(1)(B)…………………………………………...21

31 U.S.C. § 3730(b)…………………………………………………...2

31 U.S.C. § 3730(c)(3)…………………………………………....1-2

31 U.S.C. § 3730(d)(2)………………………………………………..2

31 U.S.C. § 3731(b)………………………………………………….27

**Federal Statutes (cont.)**

31 U.S.C. § 3731(b)(2)……………………………………………...1, 26-27

**State Statutes**

Mass. Gen. L. ch. 12, § 5B(a)…………………………………………….4

Mass. Gen. L. ch. 12, § 5C(2)………………………………………….2

Mass. Gen. L. ch. 12, § 5D(6)…………………………………………...3

Mass. Gen. L. ch. 12, § 5F(4)……………………………………………2

Mass. Gen. L. ch. 12, § 5K……………………………………………...1, 27

Mass. Gen. L. ch. 85, § 2……………………………………….*passim*

Mass. Gen. L. ch. 90, § 17………………………………………... *passim*

Mass. Gen. L. ch. 90, § 18……………………………………...… *passim*

**Federal Regulations**

23 C.F.R. 655.603(d)(2)…………………………………………….6, 11, 17

*Manual on Uniform Traffic Control Devices for Streets and Highways*,
74 Fed. Reg. 66,730 (December 16, 2009)………………………….*passim*

**State Regulations**

*Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control
Devices* (2012)…………………………………..………………….....*passim*

*Procedures for Speed Zoning on State and Municipal Roads*………..……*passim*

## Other Authorities

*Speed Concepts: Informational Guide*,
  Pub. No. FHWA-SA-10-001 (Sept. 2009)……………………….8, 13-14, 26

II.    Whether the resolution of a relator's previous personal private litigation precludes as res judicata a public qui tam action where the government and state remain real parties in interest.

III.    Whether noncompliance with federal and state highway statutes, regulations and procedures pertaining to arbitrarily posting and enforcing speed limit signs and advisory speed plaques are sufficient allegations of falsity to survive a motion to dismiss.

IV.    Whether actual knowledge, deliberate ignorance, or reckless disregard of arbitrarily posting and enforcing noncomplaint speed limit signs and advisory speed plaques are sufficient allegations of scienter to survive a motion to dismiss.

V.    Whether ten (10) year statute of limitations period in 31 U.S.C. § 3731(b)(2) and Mass. Gen. L. ch. 12, § 5K are available in a relator-initiated qui tam suit in which the government and the state have declined to intervene.

## ARGUMENT

### I.  Res Judicata

Claim preclusion and issue preclusion, "are collectively referred to as 'res judicata.'" Taylor v. Sturgell, 553 U.S. 880, 892 (2008). The Supreme Court has held that the United States is not a "party" where it has decided not to intervene in

1

an FCA qui tam case for purposes of the appellate filing deadline, U.S. ex rel. Eisenstein v. City of New York, 556 U.S. 928, 931-33 (2009).  Nevertheless, for purposes of res judicata, the United States remains "a real party in interest — which is to say that its financial interests are at stake." United States ex rel. Lusby v. Rolls-Royce Corp., 579 F.3d 849, 852 (7th Cir. 2009) (citing Eisenstein, 556 U.S. at 934-35).  "The special status of the United States counsels against reflexive transfer of rules of preclusion from private to public litigation."  Id.[1]

Zotos is bringing this qui tam action for violations of the FCA "on behalf of himself and the Government, pursuant to 31 U.S.C. § 3730(b)," and for violations of the MFCA "on behalf of himself and the Commonwealth, pursuant to Mass. Gen. L. ch. 12, § 5C(2)."  App. at 12 (¶ 14).  This qui tam action simply belongs to the Government and the Commonwealth, and not to Zotos.

Under the FCA/MFCA, both the United States and the Commonwealth have a financial interest in this action.  They are entitled to at least 70% of any civil damages or penalty awarded to the relator.  31 U.S.C. § 3730(d)(2); Mass. Gen. L. ch. 12, § 5F(4).  They also still have the right to intervene in this action.  Id. at §

---

[1] (holding "The resolution of personal employment litigation does not preclude a qui tam action, in which the relator acts as a representative of the public.") (citing United States v. Mendoza, 464 U.S. 154 (1984) for the proposition that "non-mutual issue preclusion does not apply to suits involving the United States"); see also, U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 336 F.3d 346, 359-60 (5th Cir. 2003) (recognizing the differences between a plaintiff's personal and qui tam actions and finding that those differences preclude a finding of collateral estoppel).

3730(c)(3); c. 12, § 5D(6).  These rights and interests were not shared by Zotos in

the prior actions.  See <u>Mendoza</u>, 464 U.S. at 159 (recognizing that "the Government

is not in a position identical to that of a private litigant" (citing <u>INS v. Hibi</u>, 414

U.S. 5, 8 (1973))).[2]

Here, Defendants accurately note that "[t]he District Court declined to apply

claim preclusion on the basis that the United States and the Commonwealth were

not parties to the prior actions."  Appellees' Brief ("AB") at 18 (citing Addendum

to Appellants' Brief ("Add.") at 36 (<u>United States ex. rel. Zotos et al. v. Town of</u>

<u>Hingham et al.</u>, 19-cv-12002-NMG (D. Mass. Jul. 21, 2023) (Memorandum and

Order).  Despite this government nonparticipation, Defendants nevertheless baldy

assert (without citing any caselaw in support of their position) that "[c]ontrary to

the District Court's res judicata conclusion, the prior cases apply to bar relitigation

of Mr. Zotos' *ultra vires* claims in this case."  AB at 17.

Defendants' argument that prior decisions on Zotos's personal actions bar

the current qui tam action ignores one crucial fact - Zotos brings this qui tam action

---

[2]  See, e.g., <u>United States ex rel. Sorenson v. Wadsworth Brothers Construction</u>
<u>Company, Inc.</u>, 2:16-cv-875 (D. Utah June 5, 2019) ("Because the United States'
interests and rights were not represented in Mr. Sorenson's state action, those
issues were not 'completely, fully, and fairly litigated,' and Plaintiff is not now
barred from litigating the issues raised in his Complaint."); <u>United States et al. ex</u>
<u>rel. Alejandro v. Philadelphia Vision Center et al.</u>, 20-2027 (E.D. Pa. January 4,
2021) (improper to bar qui tam claims as res judicata given "the Government's
inability to participate in or prevent the resolution of" relator's previous claims)
(and cases cited therein).

not just in his own right, but also as a representative for the public, i.e., for both the Government and the Commonwealth. Thus, Defendants' res judicata argument fails, because they plainly have not shown that any of the prior personal actions they reference involve either the Government or the Commonwealth.

## II.   **False Claims**

In this FCA/MFCA action, Zotos pleads and alleges facts to prove a prima facie case consisting of the following three elements: (1) a false claim (or statement in support of a claim), (2) presented (or caused to be presented) for payment [presentment uncontested], (3) with the Defendants' knowledge of the falsity of the claim or statement in support of a claim. See, Appendix ("App.") at 78-83 ("Claims for Relief"). Zotos further alleges these claims were materially false or fraudulent. Id.; Brief of the Plaintiffs-Appellants ("ZB") at 14-16, 36-37.[3]

### A. **Falsity**

The First Circuit takes a broad view of what may constitute a false or fraudulent statement to avoid "foreclos[ing] FCA liability in situations that Congress intended to fall within the Act's scope." <u>US ex rel. Jones v. Brigham and</u>

---

[3] Relator need not establish damages in order to maintain an FCA/MFCA action. See <u>United States v. Rivera</u>, 55 F.3d 703, 709 (1st Cir. 1995) ("a contractor who submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to pay out funds or to suffer any loss.") (citing cases); cf. Mass. Gen. L. ch. 12, § 5B(a).

Women's Hosp., 678 F. 3d 72, 85 (1st Cir. 2012).[4] "Taking this broad view does not, however, create limitless liability. Indeed, FCA liability continues to be circumscribed by 'strict enforcement of the Act's materiality and scienter requirements.'" [5]

In this case, Zotos alleges that Defendants' claims are false for noncompliance with express statutory, regulatory and contract terms, and express and implied misrepresentations on forms presented for payment. Specifically, he alleges that the Town had a longstanding and widespread practice of arbitrarily posting and enforcing scores of speed limit signs and advisory speed plaques on numerous roadways in deliberate noncompliance with express federal and state highway statutes, regulations and procedures (aka standards).

## 1. Federal Highway Statutes and Regulations

The FHWA Manual on Uniform Traffic Control Devices for Streets and Highways ("MUTCD") is recognized as the national standard for traffic control devices on all public roads. ZB at 20-21 (citing 74 Fed. Reg. 66,730 (December

---

[4] (finding genuine issues of material fact as to whether measurements were cherry-picked in order to produce falsified scientific data that would support hypothesis) (citing United States ex rel. Hutcheson v. Blackstone Medical, Inc., 647 F. 3d 377, 387 (1st Cir. 2011) (quoting United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1268 (D.C. Cir. 2010)) (internal quotation marks omitted)).

[5] Id. at 85-86 (citing Hutcheson, 647 F. 3d at 387-88 (quoting Sci. Applications Int'l Corp., 626 F.3d at 1280)) (internal quotation marks omitted).

16, 2009) (final rule effective January 15, 2010); see also, 23 U.S.C. §§ 109(d) and 402(a); App. at 14-16 (¶ 22).

MassDOT promulgated regulatory standards entitled "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices" ("Massachusetts Amendments") (2012), which "has been correlated with, and conforms as closely as Massachusetts laws and conditions will allow, to the standards adopted by the Federal Highway Administrator as a National Standard for application on all Classes of Highways." ZB at 21 (quoting Mass. Amend. to 2009 MUTCD at 1-2).

When traffic control devices are installed on a Federal-aid project, they shall conform to the MUTCD under 23 C.F.R. 655.603(d)(2). ZB at 22. "State highway agencies and its political subdivisions must install and maintain MUTCD compliant devices on all projects in which Federal-aid Highway funds are used." Id. (quoting Stephenson Letter (Add. at 5) (FHWA Massachusetts Division Administrator approval of Massachusetts Amendments)).

### a. Speed Limit Signs (R2-1)

Speed limit signs fall under MUTCD Chapter 2B ("Regulatory Signs, Barricades, and Gates"), § 2B.13 ("Speed Limit Sign (R2-1)"). See, App. at 16 (¶ 23 (quoting MUTCD § 2B.13)). The Massachusetts Amendments note that Mass. Gen. L. ch. 85, § 2 ("c. 85, § 2") provides municipalities the legal authority to erect

and maintain highway signs in Massachusetts, and that the statute provides in pertinent part:

> … any rule, regulation, order, ordinance or by-law of a city or town hereafter made or promulgated relative to or in connection with the erection or maintenance of signs … shall not take effect until approved in writing by the department, or be effective after such approval is revoked, if made or promulgated relative to or in connection with the following:

> … (2) any project which is or was federally aided, in whole or in part …

Mass. Amend. to 2009 MUTCD § 10A-1 ("Legal Authority") (quoting c. 85, § 2); App. at 17-18 (¶ 26 (quoting c. 85, § 2)). In addition, the Massachusetts Amendments mandate a detailed 6-step "Procedure for Establishment of Legal Speed Zones." Mass. Amend. to 2009 MUTCD § 10A-8 ("Speed Control"); App. at 28-29 (¶ 30 (quoting § 10A-8)).

As of March 2012, there were allegedly at least twenty-six (26) speed limit signs (R2-1) posted on the public roadways under the sole jurisdiction of the Town of Hingham, and without having written approval on file with MassDOT. App. at 58-59 (¶ 106). These signs pre-date 2012, as evidenced by earlier studies and speeding citations. See, e.g., App. at 65-68 (¶¶ 112-115 (Beal Street/West Street/Fort Hill Street Study from July 2006)), 60 (¶ 107 (citations from September 2011 onwards), 72-73 (¶¶ 123-125 (citations from 2002 – 2010)).

All of these speed limit signs clearly appear as "rectangular in shape, with black numerals on a white reflectorized background," which exclusively identify

regulatory speed limit signs (R2-1). App. at 58-59 (¶ 106); See, e.g., App. at 20-21 (¶ 28(c)), 27 (¶ 29(f)); MUTCD §§ 2B.02 ("Design of Regulatory Signs"), § 1A.12(L) ("Color Code") ("White – regulation").

Zotos contends that the Town of Hingham arbitrarily posted and enforced numerous posted speed limit signs (R2-1) in deliberate noncompliance with both the MUTCD's and the Massachusetts Amendments' standards regarding speed limit signs. ZB at 23 (citing MUTCD § 2B.13; Mass. Amend. to 2009 MUTCD § 10A-8), 35, 56.

Most importantly, these inappropriate speed limit signs compromise "an essential element of highway safety." ZB at 25-27 (citing "Speed Concepts: Informational Guide" ("Speed Concepts"), Pub. No. FHWA-SA-10-001, 34 (Sept. 2009) ("Safe Road for a Safer Future - Investment in roadway safety saves lives")).

First, none of these speed limit signs were approved in writing by MassDOT. These speed limit signs were located on at least eight (8) roadways (i.e., Cushing, Fort Hill, Free, Gardner (upper), Longmeadow, Prospect, Shipyard, and Tuckers). App. at 58-59 (¶ 106 (b)). Significantly, there is no record of any of these roadways appearing in MassDOT's files when it "reviewed its files and determined that its files contain Special Speed Regulations for the following ways in the Town of Hingham and have been approved by the Department of Transportation and the Registrar of Motor Vehicles." App. at 76-77 (¶ 130(c)

(Special Speed Regulations only for Main Street, East Street, Hull Street (Route 228) (1973-2008); and Charles and Lazell Street (1988)); see also, e.g., App. at 68 (¶ 116 (a) (Cushing Street) ("There is no speed regulation on file")), 70 (¶ 119 (Gardner Street) ("There are currently 30 MPH speed signs but there is no record of them"))).

The Town failed to seek State approval because it apparently believed that MassDOT would likely raise instead of lower the speed limit. See, e.g., App. at 55 (¶ 98 ("It is very possible the [State] D.P.W. might possibly increase instead of lowering the posted speed of the area in question"), 56-57 (¶¶ 101, 102), 69 (¶ 117 (Cushing Street) ("Sergeant Dearth advised against contacting the State to adjust the speed on the street as the posted speed limit [30 mph] would most likely be posted higher 40 (mph) which is not the desired outcome")).

Without written State approval, these speed limit signs are therefore in direct violation of MUTCD § 2B.13, i.e., "[t]he Speed Limit (R2-1) sign [] shall display the limit established by law, regulation, or as adopted by the authorized agency," the Massachusetts Amendments § 10A-1, i.e., signs "shall take no effect until approved in writing by the department … in connection with … any project which is or was federally aided, in whole or in part," and § 10A-8, i.e., "the Department, acting jointly with the Registry, will certify and approve."

<u>Second</u>, none these speed limit signs were established on the basis of an engineering study. The Town conducted traffic speed studies necessary to establish speed limit signs, but these universally demonstrated higher speeds than were already posted, and the Town deliberately chose to ignore the results that did not suit it. ZB at 54 (citing App. at 65-66 (¶ 112), 69-70 (¶¶ 117 (Cushing Street), 119 (Gardner Street))). These signs are therefore in direct violation of MUTCD § 2B.13, i.e., "Speed zones (other than statutory speed limits) shall only be established on the basis of an engineering study that has been performed in accordance with traffic engineering practices" and the "Speed Limit (R2-1) sign shall display the limit … based on the engineering study."

<u>Third</u>, the speed limit signs at issue are arbitrarily set below the five (5) mph increment nearest to the 85th percentile speed (as justified by the ignored traffic engineering speed studies). See, e.g., App. at 65-66 (¶ 112 (Beal Street, Fort Hill Street)), 69-71 (¶¶ 117 (Cushing Street), 119-120 (Gardner Street))). They are therefore in direct contravention of MUTCD § 2B.13, i.e., "*Guidance … 12 when a speed limit within a speed zone is posted, it should be within 5 mph of the 85th percentile speed of free-flowing traffic,*" and in direct violation of the Massachusetts Amendments § 10A-8, i.e., "[t]he final determination is based upon the 85-percentile method, which is that speed at or below which 85% of the vehicles observed were actually travelling."

Fourth, these speed limit signs were erected and maintained without following the five (5) initial steps of the Massachusetts Amendments "Procedure for Establishment of Legal Speed Zones." See, App. at 28-29 (¶ 30 (quoting § 10A-8)). Nevertheless, the Town had a longstanding and widespread practice of enforcing these speed limit signs in further direct violation of the sixth (6th) and final step. Id. See also, e.g., ZB at 56 (citing App. at 60 (¶107 (384 tickets issued for violating noncompliant speed limit signs)), 69 (¶ 117 (Cushing Street) ("tickets are issued on a regular basis")), 70 (¶ 119 (Gardner Street) ("signs which are currently posted are not permitted but are still enforceable"))).

Fifth and finally, several of these same noncompliant speed limit signs were installed on the specific federal aid projects in question before the road can be opened or reopened to the public for unrestricted use. See, e.g., ZB at 35 (citing App. at 58-59 (¶ 106 (speed limit signs)), 69-72 (¶¶ 118 (Cushing Street), 121-122 (Gardner Street)); App. at 33-34 (¶¶ 36-43) (MassDOT/Federal-Aid Projects on Cushing Street and Gardner Street located in the Town of Hingham). They were therefore in direct violation of 23 C.F.R. § 655.603(d)(2). Moreover, since none of these speed limit signs were approved in writing by MassDOT, they were in further violation of the Massachusetts Amendments § 10A-1, i.e., requiring approval of signs "made or promulgated to or in connection with … (2) any project which is or was federally aided, in whole or in part."

Defendants fail to directly address any of the above allegations of the Town's deliberate noncompliance with both the MUTCD's and the Massachusetts Amendments' standards regarding speed limit signs (R2-1). Instead, Defendants proffer the excuse that the Town was authorized to post these speed limit signs pursuant to Mass. Gen. L. ch. 90, § 17 ("c. 90, § 17").

Zotos adamantly maintains that these speed limit signs do not qualify for any "statutory" exception. Massachusetts classifies speed limits authorized under c. 90, § 17 as "statutory" (unposted) and under Mass. Gen. L. ch. 90, § 18 ("c. 90, § 18") as "regulatory" (posted):

> Under satisfactory operating conditions, speed limits can be classified into two different categories: regulatory (posted) speed limits and statutory (unposted, with some exceptions [e.g., school zone]) speed limits. MGL c. 90 §§ 18 and 18B establish the requirements for posting regulatory speed limits. MGL c. 90 §§ 17, 17A and 17C cover the criteria for statutory speed limits.

App. at 24 (¶ 29 (b) (quoting MassDOT, "Procedures for Speed Zoning on State and Municipal Roads" ("Speed Zoning") at 1 (2017)).

Likewise, the Massachusetts Amendments expressly provide that "speed control signs may be established only in accordance with the provisions of section eighteen of chapter ninety." Mass. Amend. to 2009 MUTCD § 10A-1 (quoting c. 85, § 2 (citing c. 90, § 18)). There is no corresponding standard for establishing speed control signs under c. 90, § 17.

Massachusetts' classification of speed limits substantially conforms with FHWA guidance.[6]  The FHWA also differentiates between posted and statutory speed limits (the same as Massachusetts does), and explains the process of establishing speed limits as follows:

> Speed limits are set in one of two ways: (1) determined specifically for a particular road or segment on the basis of an engineering study and displayed as a *posted speed* on a regulatory sign, or (2) a statutory speed limit that applies in the absence of a *posted speed*. Statutory speed limits are set forth in state laws.

Speed Concepts at 26.

### b.  Advisory Speed Plaques (W13-1P)

Advisory speed plaques fall under MUTCD Chapter 2C ("Warning Signs and Object Markers"), § 2C.08 ("Advisory Speed Plaque (W13-1P)").  App. at 16 (¶ 24 (quoting MUTCD § 2C.08)).

As of March 2012, there were at least thirty-four (34) advisory speed plaques (W13-1P) posted on the public roadways under the sole jurisdiction of the Town of Hingham.  App. at 61-62 (¶ 108).  All of these advisory speed plaques clearly appear as "rectangular in shape, with black letters on a yellow reflectorized [background]," which exclusively identify advisory speed plaques (W13-1P).  Id.;

---

[6] See, e.g., ZB at 22 (quoting FHWA, Frequently Asked Questions – General Questions on the MUTCD – FHWA MUTCD (Add. at 6-7) (local road agencies (as well as State DOT) must abide a State Supplement or State MUTCD that FHWA has found to be in substantial conformance with the national MUTCD)); Stephenson Letter, Add. at 5.

see also, e.g., App. at 21-23 (¶ 28(d) (quoting MUTCD § 2C.08),  MUTCD §§ 2C.03 ("Design of Warning Signs"), § 1A.12(M) ("Color Code") ("Yellow – warning").

Zotos contends that the Town of Hingham arbitrarily posted and enforced numerous advisory speed plaques (W13-1P) in deliberate noncompliance with both the MUTCD's and the Massachusetts Amendments' standards regarding warning signs.  ZB at 23 (citing MUTCD  § 2C.08; Mass. Amend. to 2009 MUTCD), 35, 56.

Most crucially, with respect to these advisory speed plaques, "[s]peed limits should not be lowered to reflect an isolated restrictive element.  This practice tends to reduce the credibility of speed limits."  ZB at 26 (quoting Speed Concepts at 35 (Advisory Speed Posting)).

First, sixteen (16) of these advisory speed plaques were installed as separate sign installations.  ZB at 56 (citing App. at 61-62 (¶ 106(d))).  These plaques are therefore in direct violation of  MUTCD § 2C.08, i.e., "[t]he Advisory Speed plaque shall only be used to supplement a warning sign and shall not be installed as a separate sign installation."

Second, none these advisory speed plaques were established on the basis of an engineering study.  The Town conducted traffic speed studies necessary to establish advisory speed plaques, but these universally demonstrated higher speeds

14

than it desired, and so the Town deliberately chose to ignore the results that did not suit it. See, e.g., App. at 63 (¶ 110 (Conservatory Park)), 65-66 (¶¶ 112-113 (Beal Street)), 70-72 (¶¶ 119-122 (Gardner Street)).

These plaques are therefore in direct violation of both MUTCD §§ 2C.02, i.e., "[t]he use of warning signs shall be based on an engineering study or engineering judgment" and § 2C.08, i.e., "an Advisory Speed plaque shall not be installed until the advisory speed has been determined by an engineering study" and "[t]he advisory speed shall be determined by an engineering study that follows established engineering practices."

Third, the Town routinely misused advisory speed plaques as "posted (suggested speed limits)." App. at 57-58 (¶ 104 (South Street)); see also, e.g., (¶ 105 (High Street) ("Lt. Haley (Fire) also suggested moving the 20 mph suggested speed sign to that area to see if that helps deter people from speeding.")), 63 (¶ 110 (Conservatory Park).

Members of the Town's Board of Selectmen, Traffic Committee, stated on several occasions that advisory speed plaques are not enforceable. ZB at 55 (citing App. at 57-58 (¶¶ 104-105), 62-64 (¶¶ 109-110)). Nevertheless, they stated that "this is not common knowledge, however so this would be helpful," and then they proceeded to have the plaques installed. Id. (citing App. at 63-64 (¶ 110)). What is more, the Town occasionally enforced advisory speed plaques. See, App. at 64-

65 (¶ 111 (6 traffic citations for violating advisory speed plaques)).

The Town's practice of posting and enforcing advisory speed plaques as "suggested speed limits" appears to be a gross abuse of the function of warning signs in contravention of both MUTCD §§ 2C.01 ("Function of Warning Signs") and § 2C.02 ("Application of Warning Signs"). "Also, advisory speeds are not enforceable, since their intent is to advise motorists of an appropriate speed through a particular condition, not regulate it." App. at 23 (¶ 28(d) (quoting Speed Zoning)).

Fourth, the Town maximized the unnecessary use of advisory speed plaques. At least thirty-four (34) advisory speed plaques were located on at least twelve (12) public roadways (i.e., Bare Cove Park, Beal, Fort Hill, French, Gardner (lower), Grenadier, Martins, North, Ship, Spring, Water, and West). App. at 61 (¶ 108 (b)). This overuse is directly at odds with and contrary to MUTCD § 2C.02, i.e., "*Guidance: The use of warning signs should be kept to a minimum as the unnecessary use of warning signs tends to breed disrespect for all signs.*"

Fifth and finally, several of these same noncompliant advisory speed plaques were installed on the specific federal aid projects in question before the road can be opened or reopened to the public for unrestricted use. See, ZB at 35 (citing App. at 71-72 (¶ 122 (Gardner Street)); App. at 34 (¶¶ 40-43) (MassDOT/Federal-Aid Project on Gardner Street located in the Town of Hingham). They were therefore

in direct violation of 23 C.F.R. § 655.603(d)(2). Moreover, since none of these advisory speed plaques were approved in writing by MassDOT, they were in further violation of the Massachusetts Amendments § 10A-1, i.e., requiring approval of signs "made or promulgated to or in connection with … (2) any project which is or was federally aided, in whole or in part."

Defendants utterly fail to address any of the above allegations of the Town's deliberate noncompliance with the MUTCD's standards regarding advisory speed plaques (W13-1P), and as a result, they effectively waive their argument as to these alleged violations.

## 2. <u>Massachusetts Highway Statutes and Regulations</u>

Massachusetts cities and towns may erect and maintain traffic signs (except speed control signs (aka speed limit signs)) "on any way within its control" without department of highways approval "provided such signs ... are in conformance with the department's current manual on uniform traffic control devices [MUTCD] ... ." Mass. Gen. L. ch. 85, § 2, ("Traffic signs or devices; erection and maintenance; rules and regulations") (enabling statute).

"In addition, MassDOT and all municipalities are required by MGL c. 85 § 2 to conform to the Manual on Uniform Traffic Control Devices (MUTCD) for the posting of all regulatory and warning signage, including speed limit signs, on all streets and highways." ZB at 39-40 (quoting Speed Zoning at 2, 7 (2017))

("MassDOT conforms to MUTCD standards and guidance … because it is the law … .").

Consequently, the enumerated allegations of the Town's deliberate noncompliance with both the MUTCD's and the Massachusetts Amendments' standards thereby logically entail equally corresponding violations of c. 85, § 2.

Defendants' hypothesis that c. 90, § 18, is not the exclusive authority for posted speed limits directly contradicts the Legislative mandate of c. 85, § 2, i.e., that "speed control signs may be established only in accordance with the provisions of [c. 90, § 18]." Such a hypothesis "is so repugnant to and inconsistent with the later enactment covering the subject that both cannot stand." Registrar of Motor Vehicles v. Board of Appeal on Motor Vehicle Liab. Policies & Bonds, 382 Mass. 580, 589 (1981) (Legislature assumed aware of existing statutes).

On the other hand, where multiple statutory provisions relate to the same subject matter (as they do here with speed limits), whenever it is possible "they should be construed together so as to constitute a harmonious whole consistent with the legislative purpose." Dowling v. Registrar of Motor Vehicles, 425 Mass. 523, 525 (1997) (citation omitted).

According to the Massachusetts Appeals Court ("MAC"), "[t]here are two principal statutes governing speed restrictions when operating a motor vehicle within the Commonwealth," namely, c. 90, §§ 17 and 18. Belezos v. Bd. of

<u>Selectmen of Hingham</u>, 99 Mass.App.Ct. 1114 (November 14, 2017) (unpublished opinion). The MAC reads c. 90, §§ 17 and § 18 together to suggest a statutory scheme, as follows:

> A reading of § 17 and § 18 together suggests a scheme for speed enforcement throughout the Commonwealth in which posted speed limits govern over the presumptive limits and the reasonable and proper standard set forth in § 17 and, on roadways without posted limits, vehicular speed is governed by § 17.

Id. at 2.

Likewise, MassDOT's standards are crystal clear that c. 90, § 18 authorizes posting numerical speed limits on <u>all</u> roadways, and c. 90, § 17 governs on unposted roadways:

> <u>*Chapter 90, Section 18 authorizes the posting of numerical speed limits on all roadways in Massachusetts.*</u> The foundation for the actual posting of a speed limit is a thorough traffic engineering study. After a study has been completed, a Special Speed Regulation is drafted and approved by the governing authority of the roadway, the Registry of Motor Vehicles and MassDOT. <u>All</u> posted regulatory speed limit signs must adhere to this approval process. <u>*If a speed limit is posted without this procedure, it is in violation of Chapter 90, Section 18, and is therefore considered illegal and unenforceable*</u>. ...
>
> ... <u>*Chapter 90, Section 17 governs the speed of motor vehicles on unposted roadways.*</u> The speed limits on roadways that fall into this category are often referred to as "prima facie" speed limits. ... <u>*prima facie speed limits cannot be posted*</u>, with the exception of a legally established school zone.

Speed Zoning at 3-4 (2012) (emphasis added); see also, ZB at 39-40, App. at 18 (¶

28).[7]

Zotos has consistently alleged "long-standing, municipal violations by the Town of Hingham, its officials and employees of Massachusetts statutes G.L.c. 90, § 18, G.L.c. 85, § 2, and the Massachusetts Highway Department Procedures for Speed Zoning on State and Municipal Roadways" ZB at 47 (citing App. at 74-75 (¶ 127); Zotos Letter at 1 (Add. 16)).

In response to Zotos's allegations, MassDOT expressly confirmed the applicability of these statutes and regulations, and offered its assistance "[i]f the Town of Hingham wishes to establish speed limits in accordance with the aforementioned statutes on any of the ways under its custody and control." App. at 76-78 (¶ 130), Boudreau Letter (Add. 21-24) (MassDOT).

Even if c. 90, § 17 is a viable alternative authority for posted speed limit signs, the signs at issue still do not meet the c. 90, § 17(1)-(4) criteria. These signs have several rates of speed:

(i) two, 15 mph signs (patently below c. 90, § 17's lowest limit of 20 mph);

(ii) nine, 20 mph signs (not within § 17(4) school zones); and,

(iii) fifteen, 30 mph signs (not within § 17(3) "thickly settled or business district").

---

[7] Mass. Gen. L. ch. 90, § 18 ("No such special speed regulation shall be effective until there shall have been erected ... *signs conforming to standards adopted by the department*, setting forth the speed or other restrictions established by the regulation.") (emphasis added).

See, e.g., App. at 58 (¶ 106 (15, 20 and 30 mph signs)), 67-68 (¶ 115 (Fort Hill Street)), 69-70 (¶ 118 (Cushing Street)), 71 (¶121 (Gardner Street))). These signs are simply irreconcilable with c. 90, § 17's presumptive speed limits, and so they belie the pretextual defense of acting under c. 90, § 17.

The Defendants do not contest Zotos's factual allegations that Hingham did not follow the requirements of the MUTCD, Massachusetts Amendments, c. 85, § 2, c. 90, § 18, and Speed Zoning in order to post the twenty-six (26) speed limit signs and thirty-four (34) advisory speed plaques at issue. If these allegations are assumed to be true, then, a fortiori, Defendants' certifications of compliance "with all applicable state laws and regulations" are therefore false.

**B. <u>Scienter</u>**

A person acts "knowingly" under the FCA if he or she "(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." <u>US ex rel. Jones</u>, 678 F. 3d at 82 (quoting 31 U.S.C. § 3729(b)). "In short, either actual knowledge, deliberate ignorance, or recklessness will suffice." <u>United States et al. ex rel. Schutte v. Supervalu Inc.</u>, 143 S. Ct. 1391, 1400 (2023).[8] "What matters for an FCA case is whether the defendant knew the claim was false." Id. at 1396.

---

[8] The FCA also specifies that the term "'knowingly' ... require[s] no proof of specific intent to defraud." Id. n. 3 (quoting § 3729(b)(1)(B)).

Zotos's allegations extensively quote Hingham's municipal records, which contain numerous candid acknowledgements that the Defendants knew the statutory and regulatory requirements for speed limit signs and advisory speed plaques. "We understand the process and the requirements associated with establishing or amending Special Speed Regulations ... ." App. at 55-56 (¶ 99 (quoting Town Administrator (2008))).

Defendants understood that speed limit signs require both traffic studies and MassDOT approval. "The State D.P.W., upon receiving the town study and reviewing the same, makes the final decisions as to the speed of the roadway." App. at 55 (¶ 98 (quoting Hingham Police Department (1989)). "[A] reduction of the current 30 mph posted speed limit … would require a traffic study and Mass Highway Approval." App. at 56 (¶ 102 (quoting Selectmen's minutes (2010)). "As for speed signs, the white signs need to be approved by the State after studies, etc." App. at 57 (¶ 103 (quoting Selectmen's minutes (2012)). "Any change to that speed limit [30 mph to 15 mph] requires a speed study, needs to meet warrants and must be approved by MassDOT." App. at 51 (¶ 90 (quoting Selectmen's minutes (2013)).

Similarly, Defendants understood that any failure to strictly adhere to the MUTCD could jeopardize Chapter 90 funds. ZB at 44. For example, the Town's DPW Superintendent consistently and frequently cautioned his fellow members on

the Town's Board of Selectmen, Traffic Committee, that the State can relinquish/withdraw/revoke Chapter 90 funds if traffic signs are installed which do not meet the proper MUTCD "warrants," "regulations," or "criteria." App. at 51-53 (¶¶ 90-92).

Zotos contends that he has plausibly laid out enough facts from which it might be reasonably inferred the Defendants believed the claims/records they presented (or caused to be presented) to the government were false, and that this satisfies the scienter requirement.[9]

First, Defendants had actual knowledge that scores of speed limit signs and advisory speed plaques in Hingham were noncompliant. Third party highway experts submitted reports to the Town identifying many noncompliant speed limit signs. See, e.g., App. at 65-68 (¶¶ 112-115 (Vanasse & Assoc., Inc., "Beal Street/West Street/Fort Hill Street Corridor Study" (2006)), 68-70 (¶¶ 116-118 (Howard/Stein-Hudson Assoc., "Road Safety Audit: Cushing St." (2011)). The MassDOT State Traffic Engineer even gave a written c. 85, § 2 "Notice to the Town of Hingham regarding the special speed regulations listed as improperly installed." ZB at 49-50 (quoting Boudreau Letter (2012) (App. at 76-77 (¶ 130))

---

[9] See, e.g., United States and Commonwealth of Mass. ex rel. Escobar v. Universal Health Servs., Inc., 780 F. 3d 504, 515 (1st Cir. 2015) (scienter requirement was satisfied by allegations that established the defendant acted in reckless disregard or deliberate ignorance of the falsity of information contained in the claims, e.g., he was admittedly "unaware that supervision was required").

(Add. at 21-24)).

Second, Defendants acted in deliberate ignorance to post and enforce noncompliant speed limit signs. There is no indication that Defendants ever simply asked MassDOT to learn whether the speed limits were properly established and signs installed consistent with the requirements of c. 85, § 2, c. 90, § 18, and Speed Zoning. See, ZB at 50 (quoting Boudreau Letter (2012) (MassDOT offered Hingham guidance on policies and procedures) (App. at 76-77 (¶ 130)) (Add. at 21-24)). Instead, they were "advised against contacting the State to adjust the speed on the street as the posted speed limit [30 mph] would most likely be posted higher 40 (mph) which is not the desired outcome." ZB at 55 (citing App. at 69 (¶ 117 (quoting Selectmen's minutes (2012)))).

Third, Defendants knew that posting noncompliant speed limit signs was, at the very least, substantially risky. "The signs which are currently posted are not permitted but are still enforceable." ZB at 54 (citing App. at 70 (¶ 119 (quoting Selectmen's minutes (2015)))). "The question is whether they are challenged in court, if it would they would be found to be illegal and the Town might be sued." Id.

According to the Supreme Court, the scienter analysis points to "what the defendant thought when submitting the false claim – not what the defendant may have thought *after* submitting it." Schutte, 143 S. Ct. at 1401. "As such, the focus

is not, as respondents would have it, on *post hoc* interpretations that might have rendered their claims accurate." Id. "[W]e do not look to legal interpretations that respondents did not believe or have reason to believe at the time they submitted their claims." Id. at 1403.

All Defendants' alleged statements pre-date any trial court decisions (beginning in 2016) which arguably upheld the lawfulness of some speed limit signs. Without any allegations regarding Defendants' knowledge afterwards, these decisions are therefore after-the-fact, and they cannot possibly have any bearing as to Defendants' alleged scienter.

Besides, naïve reliance on trial court decisions as precedent is misplaced absent some authoritative signal from the legislature or the courts of Massachusetts. Dayton v. Peck, Stow and Wilcox Co., 739 F.2d 690, 694 n. 5 (1st Cir. 1984).[10] "But these trial court decisions have no precedential force." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 11 (1st Cir. 2013) (citing Dayton, 739 F.2d at 694 n. 5).

Finally, the FAHP and Chapter 90 grant programs award money to eligible deserving municipalities to promote highway safety. See, ZB at 24-27 (FAHP), 41-44 (Chapter 90). The end product belongs to the municipalities rather than the

---

[10] (unpublished order of the Massachusetts Superior Court "does not rise to the level of persuasive, let alone binding, precedential authority and we refuse to hinge our interpretation of existing Massachusetts law on it.").

government itself. See, <u>United States ex rel. Concilio De Salud Integral De Loiza, Inc. v. J.C. Remodeling, Inc.</u>, 962 F.3d 34, 43 (1st Cir. 2020) (discussing FCA cases that provided "no tangible benefit to the government").

Defendants knowingly falsely certified that they "complied with all applicable statutes and regulations," and this utterly tainted their performance of the highway work. See, e.g., App. at 35-37 (¶ 45 (Contract)), 38-39 (¶ 48 (Reimbursement Requests)). Whether or not highway work was otherwise completed is entirely beside the point, since inappropriate speed limits compromise "an essential element of highway safety." ZB at 26-27 (quoting Speed Concepts).

Accordingly, the Defendants' false statements allegedly diverted approximately $15 million of highway grants that should have gone to eligible deserving municipalities to promote highway safety. In effect, neither the Government nor the Commonwealth received the essence of what they bargained for. See, e.g., ZB at 24-27 and 41-44 (discussing Essence of Bargain).

**C. <u>Statute of Limitations</u>**

The Supreme Court has held that the ten (10) year statute of limitations period in 31 U.S.C. § 3731(b)(2) is available in a relator-initiated suit in which the Government has declined to intervene. <u>Cochise Consultancy, Inc. v. Hunt</u>, 139 S. Ct. 1507 (2019) ("The limitations period in § 3731(b)(2) applies in a relator-

initiated suit in which the Government has declined to intervene.").[11]

Defendants' argument fails to mention either <u>Cochise</u> or § 3731(b)(2). See AB at 28. Instead, they apply the 6 year statute of limitations under the previous version of the § 3731(b) statute. Id. (citing <u>Rivera</u>, 55 F.3d at 706).

In light of <u>Cochise</u>, Zotos maintains the ten (10) year statute of limitation period in § 3731(b)(2) is available in this relator-initiated suit because both the Government and the Commonwealth have declined to intervene in this suit. See, ZB at 2-3 (Statement of the Case). Thus, any alleged claims of FCA/MFCA violations made by the Defendants on or after September 24, 2009 (i.e., ten (10) years prior to the filing of the instant Complaint on September 24, 2019) are clearly allowed to proceed under § 3731(b)(2) and Mass. Gen. L. ch. 12, § 5K.

---

[11] 31 U.S.C. § 3731(b) ("A civil action under section 3730 may not be brought - (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.").

## CONCLUSION

WHEREFORE, Relator Frederic P. Zotos, respectfully requests and prays that the dismissal of this action be vacated and reversed and that this matter be remanded for further proceedings.

Respectfully submitted,

Attorney-Relator

*/s/ Frederic P. Zotos, Esq.*
Frederic P. Zotos, Esq.
1st Cir. Bar No. 1161035
28 Old Coach Road
Cohasset, MA 02025
fzotos@pathogenics.com
January 25, 2024            (781) 836-4295

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because: this brief contains 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt Times New Roman.

Date:  January 25, 2024          */s/Frederic P. Zotos, Esq.*
                                 Frederic P. Zotos, Esq.
                                 Attorney-Relator

# CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Date:  January 25, 2024          */s/Frederic P. Zotos, Esq.*
                                 Frederic P. Zotos, Esq.
                                 Attorney-Relator